## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. _____

WILLIAM W. MILLSAPS, an individual, for and on behalf of himself and his minor children, WM (16) and SM (13),

        Plaintiff

vs.

THE HONORABLE COMMISSIONER
VICTORIA MULLEN MCKEE,
in Official Capacity
Serve: Courts Building, 2nd Floor
105 South Central Avenue
Clayton, MO 63105

and

THE HONORABLE DOUGLAS BEACH,
in Official Capacity
Serve: Courts Building, 2nd Floor
105 South Central Avenue
Clayton, MO 63105

        Defendants

vs.

MARIE BARNETT MILLSAPS, an individual

        Defendant (Rule 19)

_____/

**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTION AND DAMAGES**


**DEMAND FOR JURY TRIAL ON ALL TRIABLE CLAIMS**

1

## COMPLAINT

COME NOW Plaintiff, WILLIAM W. MILLSAPS ("Father" or "Plaintiff"), for and on behalf of himself and his children, two of whom were minors as to of the date of this complaint, WM (age 16) ("WM") and SM (age 13) ("SG" and together with WM, "Minor Children"; Father and Minor Children are collectively referred to as "Plaintiffs") and for their claims state:

## PRELIMINARY STATEMENT

1.   This is an action, *inter alia*, for declaratory and injunctive relief brought pursuant the First, Fourth, Eighth, Thirteenth and Fourteenth Amendments of the United States Constitution, the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983 (the "Civil Rights Act"), 42 U.S.C. § 1985, and the Americans with Disabilities Act of 1990, as codified at 42 U.S.C. § 12101 et seq. (the "ADA") against the Honorable Commissioner Victoria Mullen McKee ("McKee") and the Honorable Judge Douglas Beach, in their official capacities ("Beach" and collectively with McKee, the "Defendants").

2.   Defendants McKee and Beach, acting under color of law, violated Plaintiffs' rights in connection with judicial orders in the dissolution of marriage proceeding (the "Divorce") between Plaintiff Father and Marie Barnett Millsaps ("Ex-Wife").   No claims are made in this Complaint against Ex-Wife.  She is named as a Defendant solely because she is a "required party" under Rule 19(a)(1) of the Federal Rules of Civil Procedure ("FRCP").

3.   In addition to declaratory and injunctive relief against Defendants McKee and Beach, this action claims for damages against them.  To maintain the broad protections of judicial

2

immunity, state judges must maintain certain basic requirements and they may not act as "advocates" for one party, nor even for children. Judges must be unbiased and impartial. Defendants were neither. Defendants waived judicial immunity. At most, they are entitled to more limited immunity as provided for state actors such as state law enforcement officers.

4. Defendant McKee is a Commissioner assigned to the family law division of the St. Louis County, Missouri family courts. McKee was assigned to handle various legal proceedings that lead up to and included the Divorce trial (the "Trial") of Father and Ex-Wife in August 2017. McKee has no legal authority under state law to issue a binding court order; she may only report "findings" and make a "recommendations" to a state Circuit Court Judge such as Defendant Beach. Defendant Beach is obligated to thoroughly, independently, fairly, and accurately review the records and evidence. State Judges, such as Beach, must review a Commissioner's work product and make an order. Defendant Beach is not allowed to "rubber stamp" Defendant McKee's work, but he did so anyway.

5. Ex-Wife's attorneys submitted a draft order to Defendant McKee. It contained false information and an over-the-top wish list in favor of Ex-Wife. Incredibly, in a demonstration of her bias Defendant McKee signed the prejudiced order essentially verbatim. Judge Beach then failed to perform his duties and he rubber-stamped the document. The result is a travesty: a capricious, factually false order that violates Plaintiffs' rights.

6. In addition to the relief requested by Plaintiffs due to Defendants' violations of Plaintiffs' rights, this action asks this Court to void the orders by Defendants and order a new dissolution proceeding on the grounds that vital new evidence was discovered *after* the Trial.

Plaintiff Father is asking this Court, *inter alia*, to intervene with injunctive and declaratory relief. The newly discovered evidence requires a new proceeding to protect Plaintiffs' civil rights.

## JURISDICTION AND VENUE

7.       Plaintiffs bring this action pursuant to 42 U.S.C. §1983 for violations of civil rights under the First, Fourth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution (the "Constitution") and the ADA.

8.       The case presents a federal question within this Court's jurisdiction under Article III, § 2 of the Constitution and 28 U.S.C. §§ 1331 and 1343.

9.       Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

10.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c) and (f) because, *inter alia*, all the property at issue in this complaint is located in Palm Beach County, Florida.  Further, substantially all of the events at issue in the underlying Divorce between Plaintiff Father and Ex-Wife took place in Palm Beach County, Florida,

11.       Ex-Wife is joined as a necessary party pursuant to FRCP Rule 19(a)(1)(A) and/or 19(a)(1)(A) (B)(i).

## FRCP RULE 8(a)(2) STATEMENT

12.       At the time of the Divorce, Plaintiff Father and Ex-Wife were insolvent.  They owed approximately $400,000 in student loan debt (the "Federal Debt").  This was mostly joint debt with the remainder either solely Ex-Wife's debt or solely Plaintiff Father's debt.  Defendants

order attempts to fraudulently transfer substantially all of the property of Plaintiff Father to Ex-Wife and to her lawyers while ordering Plaintiff Father 100% responsible for the Federal Debt and crushing him financially.  This government ordered transfer of property and debt violates Plaintiff Father's due process and fundamental rights.  Defendants order does not meet strict scrutiny; the state does not have a compelling state interest in taking the property without paying off the Federal Debt.   The Defendants' acts also fail other requirements of strict scrutiny.

13.     Defendants ordered Plaintiff Father to pay large amounts of child support, calculated based on income Plaintiff Father made many years before the Trial.   The unconstitutional order for child support ignores Father's disability and violates his fundamental civil rights.  This improperly calculated child support ordered by Defendants is the taking of property from Father that fails the tests for strict scrutiny.

14.     Defendants severed the parent-child relationship.   Defendants ordered that Plaintiff Father and Plaintiffs Minor Children should have "no meaningful relationship."  This violates Plaintiffs' fundamental rights.  WM turns 17 years old in August 2019. SM is 13.  Both Minor Children want to spend more time with their dad and vice versa.  Defendants misuse state power to intentionally make it impractical, financially and logistically, for Plaintiff Father and Plaintiffs Minor Children to meet and to enjoy and benefit from their natural parent-child bond.  Defendants actions violate fundamental rights and do not meet the tests for strict scrutiny.

15.     Plaintiff Father already prepaid for college for all of his three children, including the two Minor Children.  This was via the Florida Prepaid College fund (the "College Fund").  Defendants violated Plaintiffs' civil rights and transferred the College Fund to Ex-Wife.  Then,

Defendants order that Plaintiff Father pay for college all over again, i.e. that Plaintiff Father pay 50% and Ex-Wife pay 50% of the college expense for all three children.  This scheme, ordered by Defendants is neither equitable nor constitutional.  The state does not have the power to order Plaintiff Father to pay for the higher education of his adult children, especially considering that he did so already with the College Fund.  The Defendants act also violate equal protection by ordering a divorced parent, Plaintiff Father, to pay for child support through the age of 21 and for college tuition for adult children until 21.  Defendants order is based on the invidious classification of divorce.  Additionally, Defendants violate Plaintiff Father's civil rights by ordering him to pay child support and for redundant college tuition for his eldest daughter, who is already eighteen (18) years-old ("Eldest Daughter").  Eldest Daughter is not a named Plaintiff in this Complaint; she is an adult and Plaintiff Father has had no contact with her for going on five (5) years.  It is a violation of Plaintiff Father's civil rights to order him to pay for Eldest Daughter's college.  He already paid for it once.  She is an adult and Defendants order is unconstitutional.  It does not pass strict scrutiny to take more property from Plaintiff Father transferring it to Ex-Wife, allegedly for child support and college tuition for Eldest Daughter.

## **BACKGROUND FACTS**

### *A.      PROPERTY ISSUES; IMPUTED INCOME; CHILD SUPPORT ISSUES*

16.      Plaintiffs had no prior ties to the State of the Missouri prior to the underlying Divorce matter.   The Minor Children and the Eldest Daughter (collectively referred to as the "Children") were all minors in 2014 when Ex-Wife moved Children from Florida to Missouri without Plaintiff's knowledge or permission.  The underlying Divorce occurred in Missouri after

Plaintiff Father was unlawfully and actionably lured there after fraud and abuse of process by Ex-Wife.

17.     Starting in December 2014, Plaintiffs Father and Minor Children were deprived of all contact with each other for sixteen (16) months.  Ex-Wife and her lawyers concealed the Children knowing that Plaintiff Father loved them and would eventually capitulate to entering Missouri to see them.  Only upon entering the State of Missouri in 2016 solely to see his Children did the State of Missouri obtain jurisdiction over the Plaintiff.

18.     The original Divorce decree was made by Defendants in November 2017 (the "Original Order").  The Original Order contains a substantial amount of misinformation, which Defendants know to be materially false.  A Motion to Amend the Order, addressing only the most straightforward and non-contested false information in the Original Order, was filed and is attached as Exhibit "A" hereto (the "Motion to Amend").

19.     After the Motion to Amend was filed, Defendant McKee met with attorneys for Plaintiff Father and for Ex-Wife in her chambers to discuss the Motion to Amend.  She acknowledged that the Original Order contained materially false information, including mathematical "mistakes" or "oversights" about amounts in evidence and documents in evidence at Trial.  The Original Order was penned by Ex-Wife's attorneys with much false information and invective against Plaintiff Father; apparently, Defendant McKee had not even read her own Original Order before signing it.  Defendant Beach then rubberstamped it without review, also.

20.     Defendant McKee stated in chambers that she would correct her "mistakes" in an

Amended Order.   An Amended Order was issued in February 2018 (the "Amended Order").

Contrary to her acknowledgement in chambers of her many "errors" in the Original Order, neither

Defendants made any corrections to the Amended Order.   The Original Order and the Amended

Order are identical in content.   Accordingly, when reference is made to the *identical* contents of

the Original Order and the Amended Order, these substantively *identical* orders may be referred to

herein collectively as, the "Order/Decree".

21.     At no time in the Divorce pleadings before, during, or at Trial did Ex-Wife seek an

unequal division of property/debt ("Property").

22.     Because Ex-Wife did not plead for an unequal distribution, Plaintiff Father neither

mounted any attack on Ex-Wife's conduct during the marriage, nor did Plaintiff Father present a

case for his meritorious conduct during the marriage.   Plaintiff Father also did not offer a defense

to Ex Wife's allegations of abuse.   He intentionally refrained from accusing her of abuse because,

*inter alia*, there was no legal necessity to do so.

23.     The Property should have been divided 50/50 because neither Father nor Ex-Wife

plead for an unequal distribution.

24.     Defendant McKee, however, awarded an unconscionable, lopsided division of

Property in favor of Ex-Wife finding that "based on the Husband's conduct during the

marriage…" *inter alia* "an unequal division of the net assets and debt in Wife's favor, is

warranted.   Order/Decree §102.

25.     The unequal division of property is not constitutional because, *inter alia*, Plaintiff

Father was denied substantive and procedural due process.  The "findings of fact" by Defendant McKee, provided to her by Ex-Wife's lawyers, lays out a biased, unfair, and untrue, picture of the marital conduct.

26.     If Plaintiff Father had been on notice that Defendants could or would award a malevolent, lopsided division of Property *even when Ex-Wife did not plead for it*, Plaintiff would have presented pertinent, exculpatory evidence.

27.     Moreover, Ex-Wife's written diaries (the "Diaries") discovered *after* the Trial are exculpatory.  The Diaries show that Ex-Wife was duplicitous in the marriage and entered it under false pretenses.  Marriage is a contract and the Diaries present a *prima facie* case for fraud in the inducement by Ex-Wife.

28.     Because Ex-Wife defrauded Plaintiff Father prior to the marriage, and at points throughout the marriage and leading up to order by Defendants, the marriage itself is and should be deemed void *ab initio* as matter of law due.

29.     Plaintiff Father made financial decisions during the time that he and Ex-Wife were together, which he would not have made if Ex-Wife had not committed fraud and misrepresentation.

30.     At the time of the separation, Plaintiff Father and Ex-Wife had approximately $0 net worth because their joint liabilities exceeded their assets.

31.     The primary asset of Plaintiff and Ex-Wife was and is a single family residence in Palm Beach County, Florida (the "Home").

32.     Ex-Wife and her attorneys have advised Plaintiff that they estimate that the Marital Home has upwards of $300,000 to $350,000 in equity ("Equity").  The Order/Decree states that the Marital Home was assigned a net value of $206,000. Order/Decree §119(A)(1).  Ex-Wife is suing Plaintiff Husband to sell the Marital Home, contending that she should receive not just the $206,000 as valued by the Order/Decree, but that she should receive actual possession of the Marital Home and sell it and receive all of the Equity.   The Order/Decree is ambiguous on this question: Is Ex-Wife entitled to $206,000 or is she entitled to possession and then to receive all of the proceeds whatever they may be?  This narrow question is the subject of a dispute between Ex-Wife and Plaintiff Father in an ejectment action brought by Ex-Wife and pending in the State of Florida.

33.     During the marriage, Plaintiff Father and Ex-Wife always agreed between them that, if the Marital Home were ever sold and the Equity dispersed, such Equity would be used to pay the Federal Debt.

34.     If Defendants' Order/Decree stands, Ex-Wife's lawyers will receive substantially all of the Equity.  This fact was known to Defendants when they made the Order/Decree.  This is relevant to an analysis of whether the taking of Plaintiff Father's Property with state power meets strict scrutiny.

35.     Ex-Wife's attorneys churned the file.   Ex-Wife's legal fees were 1000% higher than Plaintiff Father's lawyers for the same case.  Defendants know that Ex-Wife's lawyers pride themselves on never settling a case.

36.     Only by taking cases to trial can they super-size their fees.

37.     Even in a case such as this where a family has zero net worth and the Children have needs, Ex-Wife's attorneys refuse to participate in mediation.

38.     Ex-Wife's lawyers boast that they have billed Ex-Wife "a small fortune." Defendants do not scrutinize this practice.   Rather, Defendants sanction it.   They award Property in an Order/Decree drafted by Ex-Wife's lawyers.   The Order/Decree serves these lawyers, not the state interest nor the parties to the Divorce.   This is not only against public policy in the state, it is unconstitutional.   The state has no compelling state interest to perversely incentive attorneys this way.

39.     The Equity in the Home exists because, *inter alia*, during the marriage Plaintiff and Ex-Wife agreed to create the Equity.   They invested some $200,000 in renovations in the Home. This is most of the Equity.   The Equity would have been used to pay the Federal Debt already if Ex-Wife's fraud and deceptions were known to Plaintiff Father.

40.     Defendants   falsely   state   that   Plaintiff   Father   makes   $8,540   per   month. Order/Decree. § 82.

41.     The Order/Decree states that Plaintiff made over $200,000 in 2011 (six years prior to the divorce).   Order/Decree § 83.

42.     The Order/Decree itself acknowledges that Plaintiff lost that law firm job the following year in 2012.   That makes 2011 doubly irrelevant.   It was six (6) years before the Trial and the job involved was gone.

11

43.     Defendants falsely state that Plaintiff Father "did not provide income information for 2015 and 2016."  Order/Decree § 77.

44.     The fact that this is so fundamentally, totally incorrect shows that, at best, Defendants did not even read or review the draft order from Ex-Wife's lawyers.  They signed it blindly.  This shows bias and a lack of due process.  Worse, once informed of the shockingly wrong information, Defendants repeated it – maliciously using state power against Plaintiffs.

45.     Defendant McKee was specifically apprised that her Original Order is wrong when it falsely states "Plaintiff did not provide income information for 2015 and 2016."  With bias and malice to Plaintiff Father, Defendants simply repeated the falsehood in the Amended Order.

46.     Defendants imputed income to Plaintiff Father of $102,476.  There was no evidence to support this at the Trial and Plaintiff's Motion to Amend pointed this out to Defendants: "Ex-Wife provided no evidence to support imputed income to Plaintiff in the amount of $102,476."  Ex. A, § 21-22.

47.     Defendants even contradict themselves about this.  The Order/Decree falsely states that Plaintiff Father provided no income information after 2014, but then states in contradiction that "the Court finds that Husband's income has fallen since separation [in 2014]."  Order/Decree § 84.

48.     Plaintiff's Motion to Amend accurately apprised Defendants that "Paragraph 77 wrongly states that Husband's income information was not provided for 2015 and 2016, as Husband's tax return for 2015 showing a loss of $206,989 was admitted into evidence (Exhibit

M-1) and was used in determining the tax overpayments included in the property division. (See paragraph 119(b)(7))."  Ex. A § 10.

49.     The Motion to Amend correctly states "Husband also provided W-2 information for 2016 (Exhibits N-1 and N-2) as well as information regarding the closing in 2017 of the business providing his primary source of income (Exhibit O)."  Ex. A § 11.

50.     The Motion to Amend also accurately reminded Defendants that "Husband's current income information was also considered when entering the PDL Order on April 12, 2016, setting child support at $877 a month (in stark contrast to the $1,881 a month provided for in the Judgment)."  Ex. A § 12.

51.     The Motion to Amend reminds Defendants of the evidence that had been presented at trial regarding the decrease in income from 2014, "Wife conceded … that Husband's income decreased after the separation."  Ex. A § 13.

52.     Additionally, the Motion to Amend states "The uncontested testimony at trial was that Husband was not physically/medically able to practice law as he had done in the past so using past income information cannot be supported.  Further, see Exhibit A attached hereto, from Dr. Charles Metzger verifying Husband's testimony regarding his medical condition."  Ex. B § 14.

53.     Defendant McKee even acknowledged in chambers that the Original Order was incorrect.  She said she would fix it, but then did not.  Defendants signed the Amended Order, which is identical to the Original Order and contains the same false information.

54.     This failure to correct the known false information is demonstrable evidence of

malice and bias by Defendants.

55.     Plaintiff Father also separately filed a Motion for Rehearing directed to Defendant Beach, attached as Exhibit "B" hereto (the "Motion for Rehearing").  The Motion for Rehearing advised Defendant Beach of Defendant McKee's false statement as follows, "The Commissioner states that Husband's income information was not provided for 2015 and 2016, however, Husband's tax return for 2015 showing a loss of $206,989 was admitted into evidence (Exhibit M-1) and was used by the Commissioner in determining the tax overpayments she included in her property division. (See paragraphs 77 and 119(b)(7))."  Ex. B § 23.

56.     The Motion for Rehearing apprised Defendant Beach of false information in the Original Order,  "Husband also provided W-2 information for 2016 (Exhibits N-1 and N-2) as well as information regarding the closing in 2017 of the business providing his primary source of income (Exhibit O)."  Ex. B § 24.

57.     The Motion for Rehearing advised Defendant Beach that "Husband's current income information was also considered when entering the PDL Order on April 12, 2016, setting child support at $877 a month (in stark contrast to the $1,881 a month provided for in the Judgment)."  Ex. B § 25.

58.     Defendants had the evidence that Plaintiff Father's income had precipitously declined along with his health in 2015 and after.  They knew of Plaintiff's disability.  They intentionally violated his civil rights by expressly denying that that evidence was presented at Trial.

59.     Defendant McKee had herself, prior to the Divorce Trial, acknowledged that Plaintiff's income had declined after 2014 when his health problems increased and he lost substantially all of his firm's work from his anchor client.

60.     In 2016, Defendant McKee had awarded temporary child support of $877 based on Plaintiff's W2 from his employer.

61.     Defendant McKee, at that time in 2016, recognized that Plaintiff Father's income had declined due to health issues and was less than $24,000.  Two months before trial in 2017, Plaintiff's employer went out of business and the W2 income ceased as a result.  Plaintiff Father also lost his group health insurance along with his job.  Accordingly, Defendants knew that even the modest income W2 income that Plaintiff Father had was terminated just prior to the Trial.

62.     McKee had ordered child support in the amount of $877 monthly in 2016 based on that W2 income.  When that income ceased in June 2017, the child support order should have decreased following Trial in August 2017.  However, Defendants increased it.  Child support was inexplicably boosted by 214% – from $877 monthly to $1,881 monthly.

63.     Defendants even make the 214% higher child support retroactive to April 2017, five months before Trial.  That does not meet strict scrutiny.

64.     Another issue pertains to the College Fund with a liquid value of $81,500.  Defendants ordered the College Fund to Ex-Wife and took two further inexplicable actions.  First, the accounting of the division of property in the Order/Decree omits the award of this $81,500 asset.  As a result, Ex-Wife has an extra $81,500 that is, in a sense, "off the books."

65.     A second issue with the College Fund is an ambiguity in the Order/Decree as to whether the College Fund may be spent for any purpose by Ex-Wife.  If Ex-Wife is permitted to use the College Fund for any purpose other than the children's college, then the order by Defendants allowing such violates the civil rights of Plaintiff Father, Plaintiff Minor Children, and of Eldest Daughter (although she is not a named plaintiff in this Complaint since she is an adult).

66.     The College Fund should pay for the Children's college and, if not so ordered, must go to paying the Federal Debt.

67.     There is other factually false and misleading information in the Order/Decree.

68.     For example, Defendants intentionally, falsely claim that Plaintiff is awarded $61,000 in marital property in the form of Ameritrade proceeds. Order/Decree § 119(B)(9).  The total amount is at least $36,000 wrong on the face of the Order/Decree, which incorrectly states "Plaintiff removed $36,000 from Ameritrade Account … 6287,"  Defendants then used that $36,000 as an "offset" to even more money transferred to Ex-Wife and her lawyers.  Defendants know this $36,000 was a premarital asset of Plaintiff Father and yet Defendants improperly treat it as a marital asset and not as Plaintiff Father's separate property.

69.     The Motion to Amend brought this to Defendants attention: "The uncontested testimony confirmed that this $36,000 was Husband's separate property which was derived from his pre-marital Mutual of Omaha pension." Ex. A § 119(B)(9).  Defendant McKee acknowledged this in chambers, but then refused to make this basic, factual correction in the Amended Order.

**B.     *CHRONOLOGY OF RELATIONSHIP, MARRIAGE CEREMONY, SEPARATION, and DIVORCE PROCEDING IN MISSOURI***

16

*(1) Generally, Background Facts of the "Marriage" are Relevant to this Complaint*

70.     In order to more particularly set out the civil rights violations that Defendants committed against Plaintiff and his children, *inter alia*, it is advisable for this Complaint to set forth some pertinent background and chronology of the Plaintiff and Ex-Wife, their marriage, separation, and the events leading up to Trial.

71.     Plaintiff Father is a fifty-six (56) year old attorney and graduate of Duke University and The University of Chicago Law School.  He had no prior accusations of criminal activity or domestic abuse.  He does not drink.  Does not use drugs.  Did not commit infidelity.  Various evidence in Ex-Wife's own handwriting shows that during the nearly seventeen (17) year marriage Plaintiff Father, was an excellent husband and father.

72.     Defendants' Order/Decree reads as if Plaintiff Father is a one-dimensional villain and Ex-Wife a one-dimensional hero.  This is not, and was not the case.

73.     As noted above, Plaintiff Father discovered Ex-Wife's Diaries and other evidence *after* the Divorce Trial took place.  Such new information, along with other information that Plaintiff Father withheld at the Trial (because Ex-Wife did not ask for an unequal division of Property), shows that Ex-Wife had many problems and that the marriage was not a one-sided failure as Defendants assert.  She entered the marriage in bad faith.  These facts are relevant to this Complaint because of the relief that Plaintiffs seek from this Court.  The state does not have a compelling state interest in making the Order/Decree against Plaintiff Father and with malignant

consequences to Plaintiff Minor Children.  Many of the arguments that the state might make in asserting its state interest in taking Property and Children from Plaintiff Father are deeply and directly challenged by the newly discovered documents written by Ex-Wife.

*(2)* ***Marriage in 1998***

74.    Plaintiff Father and Ex-Wife met in August 1997 in Los Angeles.  Plaintiff had not yet attended law school.  He worked as a screenwriter at the time in the Writer's Guild of America.  Ex-Wife had graduated with a Master's Degree from The University of Southern California ("USC") and she was working in the entertainment industry.

75.    After weeks of dating, Ex-Wife said she wanted to be married as soon as possible. She was 32 and had never had a boyfriend.  She was eager to be married and to "begin her life."

76.    The marriage ceremony took place on March 28, 1998.

*(3)* ***Newly Discovered Evidence Needs to Be Examined; Diaries Show Marriage Contract Was Entered Into Fraudulently By Ex-Wife***

77.    Ex-Wife's Diaries show Ex-Wife entered the marriage in bad faith.

78.    The Diaries were discovered *after* the Trial.

79.    In the Diaries she wrote, on dates immediately before the wedding date and immediately after the wedding, that she hated Plaintiff Father and knew from the outset the marriage could not work.  She never told Plaintiff Father this.  If the Property is not split 50/50 on order of this Court, then Ex-Wife's bad faith – Ex-Wife's fraud – should be litigated.

80.     Ex-Wife wrote in the Diaries just before the wedding, "***Who are we kidding?  This is a disaster waiting to happen.  I want to be alone.  I don't know what to do.  I am miserable.  Truly miserable.***"

81.     Days before the marriage ceremony she wrote, "I just want time to stop.  I need to get a handle on things.  **I feel hopeless about the future**.  I feel downtrodden.  **I feel like I don't want to live**."

82.     Ex-Wife is an extreme, fundamentalist Christian who states that God frequently speaks directly to her.  Her religious worldview is self-centered.  She believes that she is a central character – the "Lone Ranger Christian" – starring in an epic, cosmic drama.

83.     She writes in the Diaries shortly after the wedding in 1998, "I was hoping for a husband that I could serve you [God] with but instead I feel totally alone, unsupported by my husband in my walk with you [God].  It makes me feel that I wasn't good enough to receive one of your godly sons as a husband – somebody like Kevin, or Dennis or Matt or Steve or Simon.  I feel like the ***Lone Ranger Christian*** yet again."

84.     Ex-Wife knew that she had deceived Plaintiff Father before the marriage, concealing from him her true views on religion and that she did not want to be married to him.  Ex-Wife wrote, "**It's my fault.  Totally and completely**."

85.     Ex-Wife also wrote in her Diaries that the couple should **not** have children, "I fear the idea of having children right now, which makes me sad.  How I dreamt of having kids, but now I just think it would be a ***disaster***."

86.     Ex-Wife states, "***It's not honest.***  I'm **not** feeling loving and supporting of him."

87.     "***I want to kill him!***" she wrote.

88.     After the wedding, the Diaries further amplify on some of Ex-Wife's ulterior motives, "How did I get myself into this mess?  Did I want to be married so badly?  Did I want to have sex that much?  Was I trying to make "my life" happen?  I don't know Lord.  I just know that this is <u>not</u> what I had dreamed off.  I want to go home either to Texas and be with [my sister] Katherine and my family or to Long Beach and be with the Hughes."

89.     Just two months after the wedding ceremony Ex-Wife wrote, "***So, it has come to huge amounts of regret that I married [Plaintiff].  Yes, [Plaintiff].  Not that I got married, but that I married him.  I wish I were still dating because if I were I could just break up with him and get on with my life.  Never have to deal with him again.***"  But, Ex-Wife did not tell Plaintiff this.  She continued the deception.

90.     Ex-Wife wrote at that time, "***I can <u>honestly</u> say that not only that I don't like him, but that I can't stand him.***"

91.     In the weeks prior to the marriage ceremony, Ex-Wife secretly wrote in the Diaries, "I feel trapped and I wish we weren't all in the midst of planning this wedding.  <u>I want to call the whole thing off.  I hate him.</u>"

92.     But, she did not "call it off."  She did not tell the truth.  She did not tell Plaintiff that she hated him.  She continued the fraud.

20

93.     Ex-Wife then wrote after the marriage ceremony, "*Please God give me hope. Not necessarily that [Plaintiff] will change but hope that you will bring me your joy in the process, that you'll give me the strength I need. Life is not that long. I can make it. I'll get to be with you in eternity and I know your long for fellowship with me here.*"

94.     The fraud and dishonesty by Ex-Wife in entering the marriage to Plaintiff is highly relevant to any fair understanding of the marriage.  That in turn is at the core of any assertion by the state that it has the right to take Property and to decide what happens with Minor Children based on what happened in the marriage.

95.     The Order/Decree presents Ex-Wife's refusal and failure to work outside the home as if it was meritorious.  This is a perverse misuse of state power, whereby the state codifies the Ex-Wife's willful refusal to assist in the financial provision toward her family and Children as Plaintiff Father's health declined.

96.     Ex-Wife can work, but blames and blamed religion for not working.  This was a source of conflict in the marriage.  Her Diaries reveal that she did not *want* to work – and felt entitled not to have to work. Ex-Wife is highly educated.  She is fluent in English and Spanish. She just refuses to work and feels entitled, in part because of her extreme fundamentalist religious views.  This, of course, implicates her freedom to practice her religion her way.  It also implicates Plaintiff Father's rights to religious freedom.

97.     Prior to the marriage, Ex-Wife wrote in her diary, "***I've been looking for someone to take care of me.***"  She continued, "***I dream about breaking a bone and being hospitalized and***

21

*getting to rest as well as someone to take care of me.*"

**(4)** ***Aziz Ghazal and a Traumatic Homicide/Suicide That Affected Ex-Wife.  Who Was
Aziz?  Why Did Defendants Refer to Aziz Ghazal in the Order/Decree?  More Newly
Discovered Evidence***

98.     Prior to her marriage to Plaintiff, Ex-Wife was embroiled in a traumatizing triple-
homicide-suicide in 1993 involving her friend, co-worker, and religious disciple, Aziz Ghazal
("Aziz").

99.     It is important and contextually relevant to explain who "Aziz" is and how this
played into the events in the marriage, including Ex-Wife's assertions about what happened and
why when she left Plaintiff on December 15, 2014 and took the Children to Missouri.

100.    The Order/Decree discusses Aziz and understanding Aziz is relevant to this
Complaint against Defendants.

101.    In 1993 Ex-Wife was a graduate student in the prestigious Master of Film Program
at USC.  Aziz was the full-time faculty member who ran the USC equipment room; Aziz and Ex-
Wife worked closely together because Ex-Wife's work-study job was assisting Aziz.

102.    Aziz troubles accelerated in 1993: his career and his marriage unraveled.  Aziz's
wife took out a restraining order against him and initiated a divorce.  During the marriage to
Plaintiff Father, Ex Wife always maintained that Aziz's wife had set-up Aziz with a false
allegation of domestic abuse in order to deprive Aziz contact with his children and hurt Aziz by
depriving Aziz of contact with his children.  This is, obviously, ironic.  This is what Ex-Wife has

done to Plaintiff – used and misused the legal system to sever the relationship between Plaintiff and his Children.

103.    Ex-Wife had convinced Aziz to "accept Jesus" and that Jesus would help him get his marriage and kids back.  Tragically, Aziz did not feel that Jesus was helping enough and he murdered his wife and daughter and himself.  Ex-Wife felt that this was her fault because she had been disobedient to God.  She says that God told her to go speak with Aziz over the Thanksgiving holiday, but that she failed God.

104.    As a result, Ex-Wife says her failure to listen to God resulted in three deaths.  Plaintiff Father disagrees with this.

105.    Ex-Wife seemed to want to feel guilty.  Over the years, Plaintiff Father frequently tried to console Ex-Wife and encourage her to absolve herself of blame.  But, she continued to say that she was at fault for Aziz killing his wife and daughter and then himself.

106.    The Order/Decree indeed references an argument between Plaintiff and Ex-Wife on December 15, 2014 and, in particular, references that the "parties talked about _**Aziz**_…" that day Order/Decree § 34.

107.    Ex-Wife had Plaintiff arrested that day in December 2014.  She was apparently having some kind of religious delusion (she denies it is a delusion), claiming to Plaintiff Father that "God" spoke and told her that "Satan" had a "plan" for Plaintiff Father to commit murder.  She was apparently concerned that Plaintiff would be "like Aziz."

108.    This was very concerning to Plaintiff Father for many reasons.  Ex-Wife's

obsession that "God" was speaking to her in this way – as "God" had allegedly done regarding Aziz, appeared to Plaintiff Father to be hysterical and dangerous.

109.   Ex-Wife told Plaintiff Father "***God told me that Satan is going to sift you like wheat.***"

110.   Plaintiff had developed several health problems that had exacerbated in the period before December 2014.  He also had a serious MRSA infection that had resulted in a large "boil" over his heart.  Ex-Wife told Plaintiff Father, "***You are like Job – everything is being taken from you!  You even have boils on your body like Job!***"

111.   Plaintiff Father learned later that Ex-Wife had been attending a cult-like group in the weeks before December 15, 2014.  The bizarre religious teachings included sensational, hysterical propaganda about "Satan" and Satan's "schemes" and "plans."  Perhaps this fanned the flames of Ex-Wife's paranoid delusions about a dark, eternal, "demonic" drama.  It apparently gas-lighted Ex-Wife's "disease" (as she calls it) about Aziz.

112.   At Trial, Ex-Wife admitted that the events with Aziz, which occurred before the marriage were "***like a disease***" that infected her thinking.  The Order/Decree states that on December 15, 2014, Plaintiff told Ex-Wife that he would "be like her friend _Aziz_ who had killed his own family and children."  Order/Decree § 33.

113.   When Plaintiff Father discovered the Diaries after the Trial, he also discovered a letter that Ex-Wife wrote about Aziz, which is attached as Exhibit "C" hereto (the "Aziz Letter").

114.   As Ex-Wife states in the Aziz Letter, "What I'm about to describe to you is the

most terrible of tragedies."

115.    The Aziz Letter is exculpatory to Plaintiff Father.  At the Trial, Ex-Wife acknowledged that her trauma with Aziz was "life changing" and "like a disease" that had infected her over the years, informing her perception of things.

116.    In the Aziz Letter, Ex-Wife writes that Aziz's wife "**had it in her mind that she didn't want Aziz to see their children anymore.  She lied to the court about him being abusive and was able to keep him from the children all together.**"

117.    This is what Ex-Wife did to Plaintiff with the aid of the Defendants who violated Plaintiffs' fundamental rights in finding that "it is not in the children's best interest that they have a frequent, continuing and meaningful relationship with their father." Order/Decree § 62.

118.    As Ex-Wife stated in the Aziz Letter, Aziz's wife's "**anger turned into hatred and she knew that the thing that would hurt him the most is would be to tear the kids away.**"  She wrote, Aziz "**was terribly heartsick for the kids**" and added, "**more than anything, [Aziz] wanted to be with the kids, to see them**."  Ex. E, pp 3-4.

119.    Again, it is no coincidence that Ex-Wife did the same thing to Plaintiff – cut him off fully and completely from his Children on false pretexts – knowing the emotional toll this could take on a man who loves his children – Ex-Wife did the same thing Aziz's wife had done. Ex-Wife did it for malicious reasons to Plaintiff Father.  She knew that it pushed Aziz so far he became homicidal.  That is why she said she was "scared" of Plaintiff Father.  She was traumatized by Aziz.  That lens – together with her delusions about Satan and God and demons –

is a *real* problem.  It skews everything for Ex-Wife.  But, the Defendants act with Ex-Wife.  They

do not scrutinize her trauma from the past and her concerning behavior in the marriage.  This is

madness codified by the state – and it is to the detriment of the Plaintiffs and their civil rights.

120.    During this period in 1993, Ex-Wife convinced Aziz to attend church with her.

She advised Aziz that Jesus would restore Aziz's family if Aziz would follow Jesus.  Aziz

"accepted Jesus" and was lead in the "sinner's prayer" by Ex-Wife.  Ex. C, p. 3.

121.    Then, Ex-Wife wrote that *Aziz "totally lost his mind."*  Ex. C, p. 7.  Aziz violated

his restraining order and murdered his wife and daughter.  He burned their bodies.  He left the

scene and killed himself.   His body was discovered weeks later.

122.    Ex-Wife felt guilty and blamed herself.   She wrote, for example, that she felt

"*pretty responsible for what had happened.*"  Ex. C, p. 8.

123.    In light of this – and Ex-Wife's own testimony at Trial that Aziz had infected her

"like a disease" – it is not difficult to connect some dots and see that Ex-Wife was delusional in

her stated fears that Plaintiff Father was a danger to her and the Children.

124.    Defendants, however, derided Plaintiff Father's testimony that Ex-Wife is

delusional in her exotic, preposterous assertions that God is directing her steps with life and death

matters animated by Satan and other demons.

125.    Ex-Wife has also always curiously maintained that the homicides and suicides

were "God's Will" because "God wanted Aziz in His kingdom" and therefore God had Ex-Wife

"witness" to Aziz and lead him to "salvation" because God knew that Aziz would commit the

murders and kill himself..

126.    On approximately the 21st anniversary of the triple-homicide-suicide (i.e. in December 2014), Ex-Wife stated that she believed she must gain "redemption" from God for failing to "prevent" the past triple-murder suicide precisely 21-years previously.   She believed that she had special revelation from God that the Aziz events were going to be repeated.

127.    Plaintiff Father continues to believe that such is, in fact, concerning and delusional.  Defendants completely dismiss Plaintiff Father's concerns.

128.    Defendants awarded sole legal and physical custody of the Children to Ex-Wife. Defendants determined that Plaintiff Father should have "no meaningful relationship" with his Children.

129.    Defendants were biased and unequitable against Plaintiff Father.  It is not reasonable that Defendants find no concerns over Ex-Wife hearing voices direct her activities.

130.    Returning to the chronology of the marriage that occurred as it began in 1998, it is apparent that issues such as Aziz trauma prior to the marriage, coupled with Ex-Wife's extreme theology and extraordinary claims that she regularly hears the voice of "God" directing her decisions and activities, constitute a more complex picture of the motives and behaviors in the marriage.

*(5)*  **_Contributions to the Marriage; Further Chronology_**

131.    As to Ex-Wife's hyper-religiosity and its affect, Ex-Wife wrote in her Diaries

before the wedding, "*I'm afraid I'm making a big mistake getting married.  Part of my fear is the idea of marriage and part of it is [Plaintiff Father].  The bottom line: I have no peace.  **The question is whether this is demonic, or your Holy Spirit, or emotional.***"

132.     The contributions to the marriage and the conduct of the parties in the marriage are more complex than the two-dimensional Order/Decree indicates.  In reality, Plaintiff Father tried to manage a marriage in a loving and responsible way.  Plaintiff has been publically flayed in many respects.  But, Plaintiff was not a monster as the Defendants wrongly state in the Order/Decree.  Ex Wife left numerous documents for many years in which she wrote that Plaintiff was an amazing husband and father.

133.     For example, in 2014, just a short time before Ex-Wife exited the marriage and took the Children to Missouri, Ex-Wife wrote to Plaintiff Father in a hand-written note, "**What a delight you are to be with.  You are an AMAZING leader and so kind and so gentle with our children.  I truly admire your interaction with them.  I have heard that there's a difference between being very nice and being kind.  'Kind' is harder, but it is the most important thing – Like when you talked to [our daughter] this morning about her attitude toward me.  Thank you!  THANK YOU for working SO HARD for our family!  I love you!**"  (Emphasis in original).  This is also exculpatory.

134.     Two years after the marriage, in approximately April 2000, Ex-Wife became pregnant with the first of three (3) children born to Plaintiff and Ex-Wife.

135.     Ex-Wife worked prior to the marriage. In 1997 prior the marriage, she was earning

salary and benefits upwards of $75,000 annually.  However, she felt it was her religious entitlement to stop working and to pressure Plaintiff to change careers and make more money.

136.    In 2002, Plaintiff and Ex-Wife had their second child, WM.

137.    Plaintiff graduated from law school in 2006 at the age of 44.

138.    Ex-Wife's and Plaintiff's third child, SM, was born in 2006 during Plaintiff final year of law school.

139.    During law school from 2003-2006, Ex-Wife urged Plaintiff to take out substantial student loans.  These loans were almost entirely for living expenses and <u>not</u> for tuition. Obviously, it was more expensive to sustain a family of five on student loans.  Since Ex-Wife refused to work, this was one of the only options if Plaintiff was going to finish law school while being financially responsible for three small children.

140.    Ex-Wife insisted that, even though she was not working outside the home, she needed full time nannies when Plaintiff was in law school: Plaintiff and Ex-Wife took out student loans in Plaintiff's name to pay for all of these living expenses.  The student loans covered the family's substantial living expenses, health insurance, medical costs, housing, and substantial expenditure's such as the full time nannies.

141.    In the final year of law school, Ex-Wife requested that Plaintiff put her pre-marital student loan into a consolidated student loan that included the money the couple had borrowed to live on while Plaintiff attended law school.  That is how the Federal Debt came about.

142.    After graduation from law school in 2006, Plaintiff accepted a position at a law firm in Florida.  The family lived in Florida until Ex-Wife took the Children to Missouri.

*(6)   Ex-Wife's Takes Children to Missouri; Prevents Contact Between Plaintiff Father and Children; Abuse of the Legal System*

143.    On December 15, 2014, Ex-Wife orchestrated the taking of the children out of Florida without Plaintiff Father's knowledge or consent.  Ex-Wife completely disrupted the lives of the Children and traumatized them in the process.   This was because of the delusion that God had spoken to her and warned her about "Satan's plan."  Given Ex-Wife's past trauma over Aziz and her increasing hyper-religiosity that God was speaking to her directly, one can be both sympathetic but also appalled.  Whatever else may be true, the Defendants misused state power to enable the religious delusions of Ex-Wife to the detriment of the Children.

144.    The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") provides that a child's home state is the state that they have lived in for six (6) months.

145.    Ex-Wife had taken the Children from Florida and had arrived in Missouri on approximately January 2 of 2015.  That meant that the six (6) month period under the UCCJEA was to have ended approximately on July 1, 2015.

146.    Ex-Wife used the legal system in Florida – having Plaintiff Father arrested.  This is shockingly similar to what Ex-Wife accused Aziz's wife of doing in the Aziz Letter.  Ex-Wife planned that Plaintiff Father would be bound up in legal troubles in Florida for months and that he would be unable to discover what was really happening as Ex-Wife relocated the Children to

Missouri.  On March 27, 2015, the prosecutor's office in Palm Beach County, Florida filed a Nolle Prosse in connection with Plaintiff's misdemeanor arrest on December 15, 2014 and the Court lifted the No Contact Order that had been in place in that case.

147.    The day following the No Contact dismissal in Florida was March 28, 2015, the couple's 17th wedding anniversary.  Ex-Wife communicated through surrogates that she wanted anniversary gifts from Plaintiff at this time as a gesture of Plaintiff's desire to work on the marriage.  Plaintiff Father overnighted $25,000 in jewelry to Ex-Wife.  He did not know the Ex-Wife's location so Ex-Wife provided the shipping address to the nanny who Fedexed the gifts for Saturday delivery at a cost of approximately $3,000.

148.    Ex-Wife kept the gifts.

149.    Despite that fact that Ex-Wife used fraud and emotional manipulation to obtain a gifts in the amount of $25,000 post-separation, Defendants awarded the jewelry as separate property to Ex-Wife.  Defendants did not account for this $25,000 even in the lopsided division of Property.  Order/Decree § 103.

150.    Neither Plaintiff nor Ex-Wife had any legal ties to Missouri and neither of them had any family in Missouri.  Ex-Wife chose to move to Missouri because she longed to live with her "spiritual leaders," Kevin and Diane Hughes (the "Hugheses"), who had started a new evangelical church in St. Louis.  Ex-Wife met the Hugheses when she was freshman in college at the University of Southern California.  She was 18-years-old at the time and the Hugheses recruited Ex-Wife to join "Campus Crusade for Christ," then indoctrinated her.  Ex-Wife had

lived with the Hugheses at several times in California, including after Ex-Wife's graduation with her Bachelor's Degree from USC.

151.    After the No Contact Order was lifted in Florida on March 27, 2015 and Ex-Wife solicited and accepted $25,000 in jewelry on March 28, 2015, Ex-Wife then stated that God spoke to her and told her to take out a restraining order in Missouri against Plaintiff Father.  On April 3, 2015, Ex-Wife filed for two restraining orders in Missouri against Plaintiff Father, who was still living in Florida and who was unaware of where Ex-Wife and his Children even were at the time.  One restraining order was for no contact with the Children, the other was for no contact with Ex-Wife.  In the requested restraining order pertaining to the Children, there were no allegations of abuse of the Children.  Plaintiff was never accused of abusing his Children.

152.    The State of Missouri had no jurisdiction over Plaintiff Father and he moved to dismiss the restraining orders.

153.    Realizing that Plaintiff Father would soon speak with the Children once the no contact was dismissed for lack of jurisdiction, Ex-Wife knew that Plaintiff Father was about to discover her intention to relocate the Children to Missouri without his consent.  So, she hatched another rouse in May of 2015.  She had her attorney contact Plaintiff Father and to communicate that she wanted to work on the marriage and that they should do a Reconciliation Agreement, attached as Exhibit "D" hereto (the "Reconciliation Agreement").

154.    The Reconciliation Agreement was executed June 24, 2015.

155.    In the Reconciliation Agreement, Ex-Wife agreed to dismiss her requested

restraining order and the allegations therein **with prejudice** <u>and</u> agreed to make *best efforts* to reconcile the marriage.

156.    Defendants McKee and Beach then signed orders to Dismiss and Terminate Ex-Wife's restraining orders **with prejudice** on July 14, 2015.

157.    Ex-Wife's intention in entering into the Reconciliation Agreement was <u>fraudulent</u> and <u>deceitful</u>.  Ex-Wife wanted money and she knew that Plaintiff Father was about to file for divorce in Florida within the six (6) months of the Children having left, so that a court in Florida would order that Florida was the home state and that the Children must be returned to Florida. She needed to buy some time.  For that, she needed to commit fraud and make Plaintiff Father have false hope that his Children were returning to Florida later that summer.  The Reconciliation Agreement undermines Ex-Wife's assertions against Plaintiff Father.

158.    After dismissing the bogus restraining order in Missouri *with prejudice* and, under the Reconciliation Agreement expressly committing to make "best efforts" to reconcile then marriage, Ex-Wife made no efforts to reconcile the marriage.  Further, she refused to allow Plaintiff Father any contact with his Children despite the stated intent of the Reconciliation Agreement.

### *(7)   Plaintiff Father Goes to See His Children; Defendants Punish Their Reunion*

159.    In February 2016, after approximately fourteen (14) months of being stonewalled by Ex-Wife as she alienated the children, Plaintiff learned through his health insurance, which still covered Ex-Wife and the children, that his youngest child had sustained several injuries, including

broken bones.

160.     Plaintiff Father then telephoned Plaintiff SM's elementary school in Missouri and requested to speak with the principal.  Plaintiff explained that he had been unable to speak with his daughter, SM, for fourteen (14) months.  The principal arranged for Father and SM to speak. From the first phone call SM indicated she was thrilled Plaintiff Father had reached her.  Plaintiff asked her on the phone if there was anything he could do for her or anything she wanted or needed.  She replied, "**the only thing I want is a hug.**"

161.     Then, every other week for two months in early 2016, the principal arranged for SM to have lunch in his office so that Plaintiff Father could have a phone call with her.  Principal, was present on all calls.

162.     Plaintiff Father had also tried beginning in February 2016 to reach his two older Children by phone at their schools, i.e. Plaintiff Minor Child WM, who was in middle school, and Eldest Daughter who was in high school.  In the initial call to reach WM at school, WM agreed to listen to Father on one call with the guidance counselor in February 2016.  WM had previously been told by Ex-Wife not to speak to Father.   So, WM simply listened.  Plaintiff spoke to WM and told him that he loved him and missed him.  The guidance counselor on the call advised father that WM listened to all that Father had to say.  At the high school, Eldest Daughter refused to take the call from Father in February 2016.

163.     It was April of 2016 and Ex-Wife still refused to permit Children to contact Plaintiff Father despite the fact that she had entered into the Reconciliation Agreement and had

dismissed the restraining order with prejudice in June 2015.

164.    Plaintiff then flew to Missouri in April of 2016, where he met his daughter, SM, in the principal's office of her school.  They saw each other for the first time in sixteen (16) months. Father brought flowers and pizza.  Plaintiff texted Ex-Wife and asked her to please not interfere with the lunch visit that was taking place with SM in the principal's office.

165.    Father then went to WM's middle school in the hopes that WM would agree to see his dad in person.  He did.  They saw each other for the first time in sixteen (16) months -- It was a tearful reunion that took place in the principal's office with the principal and vice principal in attendance.  Plaintiff Father's conduct in visiting his Children at school in Missouri in April 2016 was with the utmost concern for his Children.  They had been deprived of all contact with their loving Father.  Whatever the reason, be it Ex-Wife's religious delusions of grandeur and self-importance, her "disease" about Aziz, or manipulation of the legal system, she traumatized the Minor Children.  The Minor Children had come to believe that their Plaintiff Father had abandoned them.  They were relieved to see their Father.

166.    Father is an attorney and was careful to assure he was protected from further false allegations from Ex-Wife at these visits; accordingly, he met with his Minor Children only with school officials present.  Nothing negative or threatening had happened with the Father's visit. The school visits were essential to the mental health of the Plaintiff Minor Children.

167.    Despite the act of the love and the appropriateness of the visit after Ex-Wife stonewalled Father for sixteen (16) months, Ex-Wife took out yet another bogus restraining order

that same day.

168.     Since there were no accusations that could be made whatsoever about Plaintiff Father's conduct in visiting the Minor Children, Ex-Wife took the cynical advice of her lawyers to say that she did not feel "safe."  All she could do was to repeat her allegations from nearly two-years before – the allegations that Defendants had already dismissed with prejudice eight months earlier.  Defendants Order of Dismissal with prejudice in July 2015 expressly stated that Ex-Wife could not recycle and reuse the allegations.  Defendants McKee and Beach and Ex-Wife all agreed on that.

169.     Plaintiff Father worked for eight months trying to work get contact with his Children –to avoid any further false accusations – to demonstrate his patience and show he was not "like Aziz" who "went crazy" when he could not see his children.  Yet, none of that patience and rationality mattered.  Ex-Wife regurgitated her false allegations again.  The Defendants gave another restraining order on the same dismissed allegations – all to the detriment of Plaintiffs.

170.     Ex-Wife knew that Plaintiff had no ties to the State of Missouri and that the State of Missouri did not have personal jurisdiction over Plaintiff – accordingly, Ex-Wife cynically used the Plaintiff's children as "bait" to lure Plaintiff to Missouri because his children were suffering from alienation and estrangement.  That, as it turned out, is a despicable and cynical reason that Ex-Wife had for refusing to allow Plaintiff any contact with his Children for those sixteen (16) months.  The Aziz Letter is exculpatory on this point.  Ex-Wife knows how much Plaintiff Father and his Children love each other.  She also planned that eventually Plaintiff Father would be lured to visit his Children so that she could gain jurisdiction over him in Missouri.  So,

36

when Plaintiff Father visited his Children in Missouri out of love and concern, he was immediately served with papers for the divorce proceeding in Missouri.  He had ostensibly subjected himself to personal jurisdiction there by being served within the State.  However, this was done by fraudulent and illicit means, using the Children as "pawns" and "bait" so that Plaintiff would have to fight a legal battle out in the State of Missouri.

## COUNT I

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: VIOLATION OF DUE PROCESS WITH REGARD TO UNEQUAL DIVISION OF PROPERTY WHEN NEITHER PARTY PLEAD FOR SAME

171.    Plaintiff restates, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

172.    At no time prior to or during the Divorce Trial did Ex-Wife plead for an unequal division of property or debt.

173.    The issues, such as relative contribution to the marriage, which Defendant assert are a basis for an unequal distribution of property in favor of Ex-Wife were neither plead, nor litigated.

174.    The division of Property under the Order/Decree violates the Plaintiff Father's right to procedural due process under the 14th Amendment of the Constitution.

175.    The Defendants Order/Decree violates Plaintiffs' civil rights to equal protection

and due process under the 14th Amendment to the United States Constitution including, *inter alia*, Plaintiffs' fundamental rights to life, liberty, and property as set forth in the 14th Amendment and Plaintiffs' rights acknowledged by the Supreme Court of the United States to exist and to be incorporated into the 14th Amendment pursuant to the First, Fourth, and Eighth Amendments of the Constitution.

176.    There was no notice for Plaintiff Father to litigate the issues in the marriage that would have had bearing on the division of Property other than 50/50.  This lack of notice and failure to provide a forum for disputed facts is, *inter alia*, a deprivation of procedural due process.

177.    The Property would not have been unequally divided, or would have been divided in Plaintiff Father's favor, if due process had been afforded Plaintiff Father in a fair opportunity for the issues to be litigated.

178.    Defendants failed to ensure due process safeguards sufficient to protect Plaintiffs' fundamental interests at a standard of strict scrutiny.

179.    This Court has the authority to grant declaratory relief pursuant to 28 U.S.C § 2201(a), which provides that:

> In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

180.    The Due Process Clause of the 14th Amendment to the U.S. Constitution requires

that, *inter alia*, Defendants provide Plaintiff with a fair and impartial adjudicatory proceeding – both in appearance and in reality – that is free of any prejudgment on the key factual and legal merits of the allegations by Ex-Wife.

181.    Defendant McKee was not free from pre-judgment and she did not proceed in a fair and impartial manner in the proceeding.

182.    This lack of impartiality is further apparent from the refusal to change anything in the Amended Order compared to the Original Order.  Plaintiff filed both a Motion to Amend and a Motion for Reconsideration, each of which laid out for Defendants certain of the most significant false facts in the Order/Decree.  Even in the face of these Motions, the Defendants refused to make a correction.  Defendant McKee admitted in her chambers that the information was correct and she stated she would make and adjustment in an amended order.  But, when she and Judge Beach signed the Amended Order, it contained no changes to correct the problems. This underscores that Defendants violation of Plaintiffs' civil rights were intentional and/or that Defendants were otherwise indifferent, incompetent, or callous about the civil rights of Plaintiffs.

183.    Impartiality is a prerequisite to any assertion of judicial immunity by Defendants from a claim for damages by Plaintiffs.

184.    The Defendants conduct has caused and will continue to cause Plaintiffs to suffer immediate and irreparable harm, *inter alia*, to their civil rights. No money damages can remedy this harm.

185.    Plaintiffs are asking this Court to find that Defendants waived judicial immunity in

serving as advocates with bias and not as impartial jurists.  Absent such finding, Plaintiffs have no legal avenue by which to recover any money damages against Defendants.  This is all the more reason that, until this Court makes a ruling on the facts as to the level of immunity that Defendants have – i.e., judicial immunity or limited immunity – this Court should enjoin Defendants from their civil rights violations including the unequal division of Property.

186.    Because the Property Division is unequal and improper against Plaintiff Father it also violates the civil rights of Minor Children and damages them.  If the unequal division of Property in favor of Ex-Wife is not enjoined, and is otherwise permitted to take effect, the actual beneficiaries are Ex-Wife's attorneys who churned the file and racked up a large bill.  This is the responsibility of the Ex-Wife solely and if she was not able to manage the cost of legal representation then the Defendants may not unconstitutionally take money that belongs to Plaintiff Father and ultimately to Plaintiff Minor Children.  Such a *de facto* transfer of Property to Ex-Wife's attorney, depriving the disabled Plaintiff Father and Minor Children of Property, does not meet strict scrutiny.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the Amended Order violates the Plaintiffs' civil rights, including *inter alia*, their right to due process and fundamental rights under the Fourteenth Amendment of the Constitution; (b) declare that Defendants violated Plaintiffs' constitutional rights to due process when Defendants divided property unequally without any demand for same being made by Ex-Wife; (c)  preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active

concert or participation with them who receive actual notice of the injunction, from unequally dividing the property and debt of Plaintiff and Ex-Wife, (d) enjoin the enforcement of the Original Order and Amended Order in the unequal division of property and debt, (e) require that the property and debt be equally divided between Plaintiff and Ex-Wife, (f) award Plaintiff his costs and reasonable attorney's fees in this action, (g) finding that Defendants acted as "advocates" and not as impartial, unbiased jurists as they were required to do in order to assert a defense of judicial immunity against a claim of damages, (h) finding that Defendants acted on behalf of the state or otherwise as advocates and, as such, that they are entitled at most to the limited immunity generally applicable to state actors, (i) permit this count to be heard by a jury and for Plaintiffs Father and Minor Children to seek the recovery of damages, and (j) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT II

### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: VIOLATION OF CIVIL RIGHTS WITH REGARD TO COURT ORDERING PLAINTIFF FATHER TO PAY ALL STUDENT LOANS

187.    Plaintiff restates, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

188.    Defendants require Plaintiff Father to pay all of approximately $400,000 in Federal Debt while ordering Ex-Wife to receive the Home Equity of approximately $300,000 violates the civil rights of Plaintiff Father and Plaintiffs Minor Children.  Plaintiff Father has a fundamental

right to life, liberty, and property as set forth in the 14th Amendment as well as rights under the Fourteenth Amendment, under the First, Fourth, Eighth Amendment incorporate into the Fourteenth Amendment, and pursuant to the Thirteenth Amendment.

189.     During the marriage relationship Plaintiff and Ex-Wife made financial decisions to defer the repayment of Federal Debt until a later time and to build equity in the family home and to prioritize certain expenditures for the children.

190.     The decision to build Equity in the family home was express, intentional and agreed by Plaintiff and Ex-Wife.  So was the investment in the College Fund.  It was expressly agreed that the Federal Debt would be paid later from the sale of the Home when that occurred.

191.     The "balance sheet" of the Plaintiff Father and Ex-Wife was zero because the assets in the form of the Home Equity and the Prepaid College Fund were offset by the liability of the Federal Debt.  The Federal Debt could have been and would have been repaid during the marriage, except for the express joint decision by Plaintiff and Ex-Wife to prioritize building assets, notably e.g. in the Home Equity and the Prepaid College Fund.

192.     To award the Home Equity and Prepaid College Fund to Ex-Wife while assigning the Federal Debt to Plaintiff Father is a fraudulent transfer ("Fraudulent Transfer").

193.     Defendants seek to obfuscate the Fraudulent Transfer by assigning supposed debt of Ex-Wife to her parents.  There is no evidence that this debt exists.  It was not disclosed before Trial.  Ex-Wife announced its existence at Trial, testifying that there was no documentation of this debt.  According to Ex-Wife's testimony, this debt to her parents, which she claimed was in the

42

amount of $180,000, was accumulated after the separation.

194.    Assuming, *arguendo*, that this alleged parental debt to Ex-Wife's parent is bona fide, despite the lack of evidence and lack of disclosure prior to Trial, Defendants actions in dividing that debt to Ex-Wife and the Federal Debt to Plaintiff Father nevertheless violates Plaintiffs' civil rights.  Such is a pre-textual bifurcation of debt.  There is no rational basis for this and it certainly does not meet strict scrutiny tests.  The attempt to transfer the Home Equity and Prepaid College Fund to Ex-Wife by apportioning debt to Ex-Wife's parents, debt that is probably fictional debt at that, fails strict scrutiny.  It also is evidence of bias against Plaintiff Father.

195.    Black letter law for fraudulent transfers bars the Defendants proposed transfer of the Home Equity and Prepaid College Fund to Ex-Wife without payment of the Federal Debt.

196.    Black letter law provides that transfers of assets are not permissible while a debtor is insolvent or if such transfers make a debtor insolvent.

197.    It is a violation of Plaintiff's fundamental rights under the 14th Amendment clause, including without limitation pursuant to Plaintiff's rights to liberty and property thereunder and Plaintiff's rights pursuant to the 1st and 4th Amendments incorporated into the 14th Amendment, for Defendants to order this Fraudulent Transfer of assets to Ex-Wife instead of using these marital assets to assure that the Federal Debt is paid.

198.    Defendants violate Plaintiff Father's constitutional privacy rights by ordering the Fraudulent Transfer despite the express financial decisions of Plaintiff and Ex-Wife in respect of the Federal Debt during the marriage.  Plaintiff and Ex-Wife had a fundamental right to make

those private marital financial decisions without the prying eyes of government.   They did so and each jointly decided to defer repayment of the Federal Debt and invest in the Home Equity and Prepaid College Fund.   Plaintiff also has a fundamental right to a divorce.  If not for the divorce, the Home Equity and Prepaid College Fund, if liquidated, would be used to pay the Federal Debt.  If Plaintiff and Ex-Wife had not agreed to this, neither the Federal Debt nor the Home Equity and Prepaid College Fund would exist at the time of divorce.

199.     Among the articulated privacy rights by the U.S. Supreme Court is the right to make private decisions regarding the marital relationship. This right in conjunction with the 1st Amendment right of free association guarantees that either marriage partner may decide to terminate the marriage at any time as a constitutionally protected privacy right.  Further, it is well-established that the state may not punish the exercise of a fundamental right.  Here, this means *inter alia* that the state may not place punitive conditions upon the choice to divorce.  Defendants may not predicate the deprivation of Plaintiff's other fundamental rights upon the exercise of his fundamental right to a divorce.   Yet, that is what Defendants do; they punish Plaintiff Father, despite his disability, with crushing Federal Debt and an improper Fraudulent Transfer of assets.

200.     Defendants may not reach into the marriage to impose decisions made within the marriage post-divorce and Defendants may not penalize the decisions made within the marriage due to the Plaintiff's decision to divorce since both of these are fundamental rights.  Even if the Defendants were to find that the Fraudulent Transfer is necessary to serve a state interest, then it must past the test of strict scrutiny, which it cannot and does not.

201.     This taking of Property via the Fraudulent Transfer is not the end of the punitive

actions by Defendants against Plaintiffs financially.   The Fraudulent Transfer must be evaluated

for strict scrutiny in the context of the other civil rights violations, *infra*, which are cumulative in

their burdensomeness.   For example, Defendants require Plaintiff Father to pay large amounts of

child support to Ex-Wife, *infra* ("Imputed Child Support").   In addition, Defendants take the

College Fund from the Plaintiff Minor Children.   They transfer it to Ex-Wife, then use state power

to order Plaintiff Father to pay 50% of his children's college expenses all over again, *infra*.

Another example of the cumulative financial burdens is that Plaintiff Father must pay $50,000 in

additional legal fees to Ex-Wife's attorneys, *infra*.

202.     The totality of the burden shows the bias that Defendants have against Plaintiff

Father.  They are not acting as impartial jurists.

203.     The assignment of the Federal Debt to Plaintiff, especially coupled with the other

financial burdens imposed by Defendants, violates Plaintiff Father's 8th Amendment rights as

incorporated into the due process clause of the 14th Amendment.   The punitive financial burden

violates Plaintiff's fundamental rights under the 8th and 14th Amendment.   Further, given Plaintiff

Father's disability and health issues, the Order/Decree is a punitive, cruel and unusual use of state

power to unconstitutional hurt Plaintiff Father and, in turn, Plaintiff Minor Children.

204.     To the extent that the Defendants would assert the Amended Order serves a state

interest by the Fraudulent Transfer coupled with the other financial punishments therein on

Plaintiff, the Amended Order does not meet strict scrutiny because it tramples Plaintiff Father's

fundamental rights under the 14th Amendment's due process clause including the Plaintiff

Father's fundamental rights under the Bill of Rights incorporated therein.

205.   The totality of the financial burden including the Fraudulent Transfer of Property and the deprivation of those assets to repay the Federal Debt is a violation of Plaintiff's rights under the 13th Amendment.

206.   Given Plaintiff Father's disability and health problems it is violation of the ADA and related civil rights.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the Amended Order violates the Plaintiffs' civil rights, including in particular, their right to due process and fundamental rights under the Fourteenth Amendment of the Constitution; (b) declare that Defendants violated Plaintiffs' constitutional rights to due process when Defendants ordered Plaintiff to pay the Federal Debt and to award the Home and Home Equity to Ex-Wife; (c) preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from selling the Home or distributing the Home Equity to any person or in any manner other than to pay the Federal Debt, (d) enjoin the enforcement of the Original Order and Amended Order with regard to the Federal Debt, (e) award Plaintiff his costs and reasonable attorney's fees in this action, (f) make a finding that Defendants acted as "advocates" and not as impartial, unbiased jurists as they were required to do in order to assert a defense of judicial immunity against a claim of damages, (g) make a finding that Defendants acted as general state actors advocating on behalf of the state's interest or otherwise as advocates and, as such, that they are entitled at most to the limited immunity generally applicable to state actors, (h) permit this

count to be heard by a jury and for Plaintiffs Father and Minor Children to seek the recovery of damages, (h) order that if the Home is to be sold that the Home Equity proceeds must be used to pay the Federal Debt, and (i) grant Plaintiff such other relief as this Court may deem just and proper.

## COUNT III

### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: VIOLATION OF CIVIL RIGHTS WITH REGARD TO DEFENDANTS ORDERING PLAINTIFF FATHER TO PAY EXCESSIVE CHILD SUPPORT BASED ON INCOME HE DOES NOT MAKE

207.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

208.    Defendants order Plaintiff Father to pay "child support" in excessive amounts based on Imputed Income that Plaintiff Father does not make.

209.    Defendants falsely state that Plaintiff Father did not provide income information after 2014.

210.    When Defendants false statements in the Original Order were brought to the attention of the Defendants in the Motion to Amend and the Motion for Rehearing / Reconsideration, Defendants willfully refused to correct the Original Order and reiterated the false information in the Amended Order.

211.    Ordering the payment of child support based on income that Plaintiff Father does not make, and in contradiction to the evidence about Plaintiff Father's health problems is a civil rights violation of the fundamental right to life, liberty, and property as set forth in the 14th Amendment as well as fundamental rights under the Fourteenth Amendment, under the First, Fourth, Eighth Amendment incorporate into the Fourteenth Amendment, and the Thirteenth Amendment.  The Defendants further violated Plaintiff Father's rights under the ADA.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the Original Order and Amended Order violate the Plaintiffs' civil rights, including in particular, Plaintiff Father's right to due process and other fundamental rights under the Fourteenth Amendment of the Constitution and/or other protections of the Fourth Amendment; (b) declare that Defendants violated Plaintiffs' constitutional rights to due process when Defendants ordered Plaintiff to pay child support based on; (c)  preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from ordering Plaintiff Father to pay child support other than on the income actually made, (d) find that Defendants willfully made a false finding of Plaintiff's income, ignoring facts in evidence regarding income, (e) award Plaintiffs costs and reasonable attorney's fees in this action, (f) make a finding that Defendants acted as "advocates" and not as impartial, unbiased jurists as they were required to do in order to assert a defense of judicial immunity against a claim of damages, (g) make a finding that Defendants acted as general state actors advocating on behalf of the state's interest or otherwise as advocates and, as such, that they are entitled at most to the limited immunity generally applicable to state actors, (h) permit

48

this count to be heard by a jury and for Plaintiffs Father and Minor Children to seek the recovery of damages, (h) order that Defendants may not order Plaintiff Father to pay excessive child support, and (i) grant Plaintiffs such other relief as this Court may deem just and proper.

### COUNT IV

### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF: VIOLATION OF CIVIL RIGHTS UNLESS NEW TRIAL IS REQUIRED IN LIGHT OF NEW EVIDENCE OF FRAUD OF EX-WIFE'S ENTERING THE MARRIAGE

212.   Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

213.   Defendants' actions before, during, and after the Trial presupposed that Ex-Wife was mentally stable and that Plaintiff Father was a villain.  This unfairness meant that the Plaintiff Minor Children and Plaintiff Father were kept estranged by the power of the state in a violation of civil rights.

214.   Unless the Property is divided on a strictly 50/50 basis, new and additional evidence must be considered to justify any unequal division.  This includes the Diaries.  That evidence shows that Ex-Wife is and was unstable and that her testimony at Trial is not reliable.

215.   Moreover, since the marriage contract was entered into fraudulently by Ex-Wife, Defendants have no legal basis to take Plaintiff Father's portion of the "marital property" and transfer to Ex-Wife other than, at most, on a 50/50 basis.

216.    Unless this Court orders the division of Property on a strictly 50/50 basis, then the Diaries and other evidence of Ex-Wife's fraud in entering the marriage must be adjudicated to protect Plaintiff Father's civil rights.

217.    If the Amended Order is not enjoined by this Court, and is enforced by the State of Missouri without consideration of the Diaries and fraud, then Plaintiff Father will further have his civil rights violated against the Fourteenth Amendment, under the First, Fourth, Eighth Amendment incorporated into the Fourteenth Amendment, and otherwise.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that a new trial must occur in the appropriate venue to consider the additional evidence of fraud by Ex-Wife in entering into the marriage, (b)  preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from ordering Plaintiff Father to transfer any property to Ex-Wife or to pay child support other than on the income actually made, and (c) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT V

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: VIOLATION OF CIVIL RIGHTS IN TAKING BUSINESS PROPERTY AGAINST AS EXPRESSLY AGREED IN CONTRACT

218.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding

paragraphs.

219.    Plaintiff Father's business had $40,000 in business property, specifically coins ("Coins").  Under the Reconciliation Agreement, Plaintiff and Ex-Wife memorialized that the Coins belong to Plaintiff Father's law firm.  They expressly agreed that Ex-Wife had concealed the Coins from Plaintiff Father, that Plaintiff Father needed the Coins, and that the Coins would be provided by Ex-Wife to Plaintiff Father.

220.    Defendants violated Plaintiff Father's fundamental rights when Defendants took the Coins from Plaintiff Father and order them transferred to Ex-Wife.  The taking of the Coins violated Plaintiffs rights under the Fourteenth Amendment, under the First, Fourth, Eighth Amendment incorporated into the Fourteenth Amendment, and otherwise.

221.    The taking of the Coins by Defendants violates equal protection.  Plaintiff Father and Ex-Wife agreed within the marriage that the Coins belonged to Plaintiff Father's business. Divorce is an invidious classification and the Defendants decision to take the Coins against the private agreement of the couple during the marriage is, *inter alia*, a violation of fundamental privacy rights and of equal protection.

222.    The Defendants further then valued the Coins at only $12,000 in the division of Property in the Order/Decree whereas the true value of the Coins was $40,000.

223.    As a result of the unconstitutional seizure, the Defendants compounded other problems for which Defendants then blamed Plaintiff Father.  For example, under the Reconciliation Agreement Plaintiff Father and Ex-Wife expressly acknowledged that Plaintiff

Father *needed* the Coins to pay bills and expenses of the law firm, to generate income, and to pay the mortgage on the House.

224.     Defendants did not hold Ex-Wife accountable for seizing and then withholding the Coins contrary to the Reconciliation Agreement.

225.     Defendants blamed Plaintiff Father for failing to do things that were financially impracticable once Ex-Wife took the $40,000 in Coins, e.g. not paying the mortgage on the House, not advertising his law firm and increasing his income, and for not visiting Children for expensive supervised visits.  Perversely, Defendants ordered the Coins taken from Plaintiff Father and awarded to Ex-Wife.

226.     It is expensive to visit the Plaintiff Minor Children out of state, to travel, and to pay the expenses of supervised visits, which typically cost $50 per hour.  The improper seizure of the Coins made it, and continues to make it, financially impracticable to visit the Minor Children. Defendants set up a chain of financial obstacles for Plaintiff Father to visit Minor Children and then Defendants perversely blame Plaintiff Father for not visiting his Minor Children frequently.

227.     Plaintiff Minor Children were damaged by the Defendants unconstitutionally taking the Coins because such created one of several improper obstacles to more frequent contact between Plaintiff Father and Plaintiff Minor Children.

228.     Defendants did not meet strict scrutiny in taking Plaintiff Father's Property, particularly the Coins.

229.     WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in

their favor and against Defendants, and award the following relief: (a) declare that the Coins belong to the Plaintiff, (b)  preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to return the Coins to Plaintiff Father, (c) to determine that the transfer of the Coins to Ex-Wife in the Original Order and Amended Order was a violation of Plaintiffs' civil rights that does not meet the requirements of strict scrutiny, (d) to declare that with regard to the Coins the Defendants acted as advocates and not as neutral state actors who acted with due impartiality, (e) find that Defendants do not have judicial immunity with regard to the Coins but have at most limited immunity and are accordingly subject to damages, (f) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (g) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT VI

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: VIOLATION OF CIVIL RIGHTS IN AWARDING $50,000 TO EX-WIFE'S ATTORNEYS

230.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

231.    Defendants drove up the cost of litigation, then blamed Plaintiff Father and ordered an arbitrary and unconstitutional seizure of Plaintiff Father's Property in violation of Plaintiffs civil rights.

232.    Defendants know Ex-Wife's attorneys intimately.  Defendants know that Ex-Wife's attorneys always "churn the file" and that they never settle a case.  Defendants participated in this practice for one or more of the following actionable reasons: (a) willfully to benefit Ex-Wife's attorneys, (b) willfully to obtain *quid pro quo* from Ex-Wife's attorneys, (c) to unconstitutionally "punish" Plaintiff Father, (d) due to unconstitutional bias whereby Defendants failed to act as impartial, neutral judges, (e) to cover their own delays and mistakes in the time prior to Trial, and (f) due to arbitrary, capricious indifference to Plaintiffs.

233.    The Defendants use state power to order that Plaintiff Father pay $50,000 in Ex-Wife's attorney's fees, allegedly for increasing the cost of the litigation.

234.    Defendants also order that this $50,000 is "characterized as maintenance" to Ex-Wife and that it cannot be discharged by Plaintiff Father in Federal bankruptcy.

235.    In characterizing this "maintenance" that cannot be discharged, the Defendants contradict their Order/Decree, which states that Plaintiff cannot afford maintenance.

236.     Defendants violated Plaintiff Father's civil rights when Defendants made this order.  The violations are under the Fourteenth Amendment, and under the First, Fourth, Eighth Amendment incorporated into the Fourteenth Amendment, and otherwise as asserted in this Complaint.

237.    Defendants themselves ran up the cost of litigation.  For just one example, this matter was set for Trial in December 2016 under rules and guidance imposed on St. Louis County family courts.

238.    The Missouri Supreme Court set up rules that track whether judges in St. Louis County are compliant with the judicial policy that family court matters should be tried within one year of filing.  This rule was created because family law cases in St. Louis were being delayed too long, resulting in large legal fees.

239.    The rule was created to act as a deterrent to State commissioners and judges who permitted attorneys to rack up large fees and bleed divorcing families dry in the process.  In short, the policy was intended to curtail the abuse of file churning by family law attorneys such as Ex-Wife's lawyers.

240.    Defendants *sua sponte* dismissed the pending divorce trial set for December 2016 for their own purposes or perhaps because they knew it would help Ex-Wife's attorneys churn the file and generate more fees.

241.    Plaintiff Father did not want nor seek the delay but was forced by the Defendants action to comply with the delay.

242.    Plaintiff Father spent around $25,000 for all of his legal fees through Trial.  This total amount was 10% of Ex-Wife's total legal fees.  Put another way, Plaintiff Father's legal fees were less than 50% of the amount that Defendants claim that was caused incrementally by Plaintiff Father in regard to Ex-Wife's fees.

243.    Plaintiff did not cause marginal costs to Ex-Wife's attorneys.

244.    Defendants pulled the figure of $50,000 from thin air and do not even remotely attempt any justification for the particular amount.

245.    Plaintiff Father was not afforded any due process for this $50,000.  It is a taking of Property under the Constitution.  There was no process to review any information whatsoever about how the Defendants arrived at this arbitrary and exorbitant amount.

246.    The seizure of the $50,000 and the characterization of it as "maintenance" that is not dischargeable in bankruptcy triggers strict scrutiny because it relates to Plaintiff Father's fundamental rights.  This does not pass strict scrutiny.

247.    It also relates to the civil rights of the Plaintiff Minor Children.  Any financial future of the Plaintiff Minor Children would appear to rely on the financial recovery of Plaintiff Father based on other aspects of the Original Order and Amended Order from the Defendants.  As such, it is an actionable violation of the Plaintiff Minor Children's civil rights to transfer this property to Ex-Wife's attorneys.

248.    For Plaintiff Father and Plaintiff Minor Children to repair their relationship, particularly with the expense and obstacles imposed by Defendants, infra, the Plaintiffs need funds.  Taking these funds from Plaintiffs compounds the obstacles that Defendants imposed on Plaintiffs, especially so because Plaintiff Father lives outside the State of Missouri and must travel to visit Minor Children.

249.    WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the award of the $50,000 was made without due process, (b) declare that the award of the $50,000 is a violation of fundamental rights that does not pass strict scrutiny,  (c) preliminarily and permanently enjoin

Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to prevent the taking of the $50,000, (d) to declare that with regard to the $50,000 award to Ex-Wife's attorneys the Defendants acted as advocates and not as neutral state actors who acted with due impartiality, (e) find that Defendants do not have judicial immunity with regard to the $50,000 but have at most limited immunity and are accordingly subject to damages, (f) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (g) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT VII

### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: DEFENDANTS INTENTIONAL REFUSAL TO CORRECT KNOWN FALSE INFORMATION IN ORIGINAL ORDER

250.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

251.    Defendants made false statements in the Original Order.  These were not mere "mistakes."  The numerous false statements included misstatements as to the amount of property, evidence provided at trial as to property and income, and other material facts.

252.    Plaintiff Father filed appropriate post-trial motions, including a Motion to Amend.

253.    Defendant McKee acknowledged in chambers that she had incorrect information in the Original Order.  She stated that she would correct that false information.  But, she issued the

57

Amended Order without any corrections.  Defendant Beach, also having been apprised of the false information in the Original Order, refused to correct that false information.  Both Defendants signed the Amended Order with the same false information as the Original Order.

254.    Defendants actions shows that they did not act as impartial state judges, but as biased actors.  Accordingly, at best, they jettisoned judicial immunity for the more limited immunity as state actors behaving in advocate roles against Plaintiffs.

255.    Defendants violated Plaintiffs civil rights.

256.    WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the award of Amended Order was made without due process, (b) declare that Amended Order contains false information that was known by Defendants to be intentionally false, (c) preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to refrain from enforcing the Original Order or Amended Order until at least such time as the known false information is corrected, (d) to declare that Defendants acted as advocates and not as neutral state actors who acted with due impartiality, (e) find that Defendants do not have judicial immunity with regard to foregoing acts and omissions, but have at most limited immunity and are accordingly subject to damages, (f) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (g) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT VIII

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: DEFENDANTS ORDER FLORIDA COLLEGE TO EX-WIFE AND REQUIREMENT FOR PLAINTIFF TO PAY FOR COLLEGE AGAIN; CHILD SUPPORT FOR ALIENATED ADULT CHILD

257.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

258.    Plaintiff Father paid tuition in advance for college for the Minor Children and for Eldest Daughter.  This was done through the State of Florida's Prepaid College Fund.  The cash value of the College Fund is approximately $81,500.

259.    Defendants awarded the Prepaid College Fund to Ex-Wife.

260.    Despite awarding the Prepaid College Fund to Ex-Wife, the Defendants did not even include the $81,500 value of the Prepaid College Fund as an asset awarded to Ex-Wife.

261.    Defendants' action in omitting the value of the $81,500 to Ex-Wife was done intentionally by Defendants because the award of these funds makes the lopsidedness of the division of assets and debt more egregious against Plaintiff Father.  Defendants, in attempting to obscure the award of the $81,500 to Ex-Wife, further show their bias and advocacy against Plaintiff.

262.    Defendants then require Plaintiff Father to pay *again* for the college of the

children.

263.    Plaintiff Father is under no legal obligation to pay for his children's college education.  If the draconian and unconstitutional taking of his property is not enjoined by this Court, Plaintiff Father cannot pay for the children's college.

264.    Plaintiff Father desires, assuming *arguendo* that this Court stops the Defendants unconstitutional civil rights violations imposed by the Original Order and Amended Order, that his children attend college and that he help them financially in that regard.  Accordingly, the Prepaid College Fund could and should be used solely for the benefit of the college education of the children as originally agreed by Plaintiff and Ex-Wife.

265.    Yet, the Defendants order Plaintiff Father to pay 50% of the cost of college for all three of his children.  This is ordered in addition to what was already paid under the Prepaid College Fund.

266.    The taking of the Prepaid College Fund and award to Ex-Wife for any purpose other than what was privately agreed during the marriage is a violation of Plaintiff's fundamental rights and to equal protection.

267.    Private decisions made in the marriage by Plaintiff Father regarding the funding of his children's college fund involve a fundamental right to privacy, *supra*.  It is a violation of equal protection for the Defendants to take the Prepaid College Fund and use it for a different purpose based on the invidious category that Plaintiff Father is divorced, *supra*.

268.    Plaintiff Father has no contact with Eldest Daughter and she is alienated from him.

60

Plaintiff Father and Eldest Daughter were very close until Ex-Wife took her from the State of Florida. Regardless, whatever the cause of the alienation it is a tragedy for all involved. Further, it is a violation of Plaintiff Father's civil rights to require him to pay for Eldest Daughter's college. Plaintiff Father paid for it already in full through the Florida Prepaid College program.

269.    Defendants declare that Plaintiff Father must pay child support for three (3) Children. This includes Eldest Daughter even though she is eighteen years-old and has finished high school. She has all the rights of an adult.

270.    Eldest Daughter and Plaintiff Father have had no contact for years.

271.    Defendants order child support for her at this point is a state ordered transfer of Property from Plaintiff Father, which violates his civil rights.

272.    Because the civil rights violations are, *inter alia*, fundamental rights the order to take Plaintiff Father's income/property in connection with his adult Eldest Daughter by Defendants does not pass strict scrutiny.

273.    WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the Florida Prepaid College Fund be used for the college of the children as agreed in the marriage, (b) declare that if the Prepaid College Fund is not used in this manner, that the amounts in the fund must be used to Federal Debt, (c) preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to refrain from enforcing the Original Order or

Amended Order with regard to the Prepaid College Fund and with regard to any attempt to require Plaintiff Father to pay for any of the children's college or for any child support past the age of 18, (d) to declare that Defendants acted as advocates and not as neutral state actors who acted with due impartiality with regard to the foregoing, (e) find that Defendants do not have judicial immunity with regard to foregoing acts and omissions, but have at most limited immunity and are accordingly subject to damages, (f) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (g) grant Plaintiffs such other relief as this Court may deem just and proper.

## <u>COUNT IX</u>

## <u>REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: DEFENDANTS ISSUANCE OF A RESTRAINING ORDER AND LIMITATION ON CONTACT WITH CHILDREN AFTER DISMISSAL WITH PREJUDICE</u>

274.    Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

275.    Ex-Wife took out a restraining order in the State of Missouri in April 2015.

276.    The Reconciliation Agreement provides prima facie evidence that Ex-Wife filed this restraining order in bad faith.  In the Reconciliation Agreement, Ex-Wife agreed to drop the restraining order and to dismiss *with prejudice*.

277.    Defendant McKee ordered dismissal with prejudice in July 2015.  For the next ten

(10) months Ex-Wife prevented contact between Plaintiff Father and his three (3) Children.  As of April 2016, Plaintiff Father had neither spoken to nor seen WM for sixteen (16) months, i.e. since December 2014 when the children were taken from Florida.  Plaintiff Father had spoken to his daughter, SM, at her elementary school a few times starting in February 2016, so a total of fourteen (14) months.

278.    Plaintiff Father flew from Florida to Missouri in April 2016 to see his Minor Children.

279.    Plaintiff Father was careful not to do anything whatsoever that could be construed as threatening to children or to Ex-Wife.  As an attorney, he knew that the prior allegations against him could not legally be a basis for a restraint on his contact with his children because of the *dismissal with prejudice* ten (10) months previously.

280.    Yet, Ex-Wife made the exact same allegations against Plaintiff Father again when he visited the Minor Children at their schools in the presence of the school principals.

281.    This was a demonstration of a father's love in coming to Missouri.  The system had completely let down Plaintiff Father and Minor Children.

282.    Defendant McKee then issued another restraining order against Plaintiff Father in April 2016.  This was contrary law.  It created a chain of events of alienation, additional expense, and it damaged Plaintiffs.

283.    The April 2016 order restricting Plaintiff Father was issued by Defendant McKee with bias and not as the action of a state judicial official who honored even her own prior order of

dismissal with prejudice.

284.     The April 2016 restraining order was a violation of civil rights of the Plaintiffs.

285.     WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that issuance of the April 2016 restraint on contact with Minor Children was a civil rights violation, (b) declare that Defendants acted as advocates and not as neutral state actors who acted with due impartiality with regard to the foregoing, (e) find that Defendants do not have judicial immunity with regard to foregoing acts and omissions, but have at most limited immunity and are accordingly subject to damages, (f) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (g) grant Plaintiffs such other relief as this Court may deem just and proper.

## COUNT X

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES: DEFENDANTS SEVERING PARENTAL RELATIONSHIP, UNCONSTITUTIONAL OBSTACLES AND COSTS TO CONTACT

286.     Plaintiffs restate, adopts and incorporates by reference, as if set out fully and completely in this Count, the following statements of each and every allegation of the preceding paragraphs.

287.     Defendants violated Plaintiffs civil rights as to the parent-child relationship.

288.     Plaintiff Father and Plaintiffs Minor Children had a close and loving relationship prior to Ex-Wife taking them from the State of Florida in December 2014.

289.    Plaintiff Father and Plaintiffs Minor Children love each other and are working hard to preserve, nurture, and build the parent-child relationship as of the date of this Complaint.

290.    Defendants assert false claims in the Order/Decree regarding Plaintiff Father and his relationship with his Minor Children.

291.    Defendants violated the Plaintiffs fundamental rights when they declare that the Minor Children should not have meaningful relationship with Plaintiff Father.

292.    Defendants put up obstacles to Plaintiff Father and Plaintiffs Minor Children having a meaningful relationship.  These obstacles violated Plaintiffs' civil rights.

293.    Prior to the Trial, Defendants with the participation of the Guardian ad Litem ("GAL") ordered "reconciliation counseling" to be done by counselors at "The Right Solution" ("TRS") between Father and Minor Children.

294.    TRS stated that they were not qualified to do the counseling.  The counselors stated that they did not know how to do this with an out of state parent and stated that they had no plan to do it.

295.    TRS stated that this "reconciliation counseling" could not be done via Skype.

296.    After choosing and ordering Plaintiffs and TRS to do this "reconciliation counseling," Defendants then inexplicably, unfairly blamed Plaintiff Father for not participating in counseling with TRS.

297.    Defendants blamed Plaintiff Father for not doing counseling via Skype.  But, it was

TRS that refused to do counseling via Skype.

298.    Plaintiff Father asked the GAL, directly and through his counsel, to engage other counselors aside from TRS to help him and Plaintiffs Minor Children, but the GAL refused.

299.    The GAL rebuffed Plaintiff Father and stating that the Defendants had chosen the counselors and that Plaintiff Father had no standing to request otherwise.

300.    The GAL advised Defendants of TRS inability to do the ordered counseling.

301.    Plaintiff Father, when he was stonewalled by TRS, the GAL, and Defendant McKee on the counseling with Minor Children, hired an outside psychologist in Florida to contact TRS and try and move things forward.  That psychologist also got nowhere.  This shows another way that Plaintiff Father made efforts, but was stonewalled.

302.    Defendants falsely allege that Plaintiff Father refused to participate in counseling with the Minor Children.  The opposite is true.

303.    Plaintiff Father was unable to get the assistance of the GAL and the court-appointed counselors at TRS to set out any kind of plan whatsoever.

304.    Plaintiff Father was shackled by the Defendants as to which counselors could be used, he was denied the chance to arrange counselors other than TRS, and then was falsely blamed by Defendants for not caring about counseling with the Minor Children.

305.    Due in part to the Defendants wrongfully entering the April 2016 restraining order despite the dismissal with prejudice of all allegations in July 2015, Plaintiff Father's attorney

entered into the consent order with TRS to do a "custodial evaluation."

306.    This was hardly by "consent."

307.    Defendant McKee uses threats and manipulation off the record in chambers to accomplish so-called "consent" orders.

308.    Lawyers, including the GAL, and pro se litigants who go before McKee know that if she does not get her way when she demands a "consent" order that she will act punitively toward the person.

309.    Defendant McKee manipulated the litigation improperly, including the GAL.

310.    Defendant McKee and the GAL improperly coerced a "consent" order regarding a custodial evaluation of Plaintiff Father.

311.    The custodial evaluation by "consent" was with TRS.  It was only to cost $2,500, was to be done contemporaneously with the counseling ordered by the Defendants, and was only to involve Plaintiff Father taking an MMPI test.

312.    Plaintiff Father already had multiple counselors and he provided a full released for all to speak to his counselors.  Three different counselors wrote letters stating that Plaintiff Father was not a danger to himself or others.

313.    Because, *inter alia*, the consented evaluation with TRS was relatively inexpensive and also because TRS was appointed to do the "reconciliation counseling" simultaneously, Plaintiff Father's counsel reluctantly agreed to the "consent" order of evaluation by TRS.

314.     As it turned out after five months from the "consent" order the Defendants advised Plaintiff Father that TRS was "refusing the appointment" of the evaluation after Defendants had chosen TRS.

315.     Then Defendant McKee demanded that Plaintiff Father do an evaluation with a different person, but this time the fees were a whopping $10,000, which was not affordable to Plaintiff Father.

316.     Defendants falsely state in the Order/Decree that Plaintiff Father refused to participate in the counseling.  The opposite is true.

317.     TRS advised the GAL, who was responsible to advise Defendants, that the <u>Minor Children love Plaintiff Father and wanted more contact with him</u>.

318.     TRS advised that "reconciliation counseling" was <u>not even necessary</u> and that "at most" Plaintiff Father and Plaintiff Minor Children needed only 4 sessions of therapy of 45-minutes each.  Plaintiffs did these 4 sessions.  TRS said that the counseling was complete.

319.     Plaintiff Father provided full releases to the GAL for three (3) different counselors who had seen Plaintiff Father long term and found him to be no a danger to anyone.  The GAL refused to contact these counselors.  Defendants knew about this from the GAL.

320.     Plaintiff Father provided letters from these counselors to the GAL who had a duty to Plaintiff Minor Children.  Plaintiff Father offered the letters from these counselors to the Defendants.  The GAL and the Defendants refused to contact the counselors and intentionally ignored the letters.  This was improper.  It was unjust.  It shows bias.  It damaged the Plaintiffs.

321.    Before and after Trial, Defendants took steps to sever the parent-child relationship in violation of Plaintiffs' civil rights.

322.    The Original Order and Amended Order only permit Plaintiff Father and Plaintiff Minor Children to meet for 8 hours twice monthly – on the second and fourth Saturday of each month.  The visits must be supervised.  There are only two supervisors who are permitted to do the visits.  These are the most expensive supervisors and they are not available on some of the Saturdays.

323.    The Defendants, knowing that Plaintiff Father lives in Florida, do not even permit him to come a few days in a row.

324.    <u>Each visit</u> to see the Minor Children costs approximately $3,000 for travel and the cost of supervision.

325.    Defendants violated Plaintiffs civil rights by improperly restricting visits, i.e. allowing Plaintiffs to see each other only on two (2) days each month – *non-consecutive days that require travel back and forth between Florida and Missouri.*

326.    The restrictions violate fundamental rights and do meet the requirements of strict scrutiny.

327.    The financial burden imposed by Defendants on Plaintiffs' visits is all the more transparently punitive and wrong when viewed in the context of the rest of the financial burdens imposed on Plaintiff Father by the Order/Decree.

328.     Defendants impose huge financial obstacles to Plaintiff Father and Plaintiff Minor Children healing and continuing their parent-child relationship.

329.     The large costs of travel and supervised visits incurred by Plaintiff Father in visiting his Minor Children are not credited as child support by Defendants.

330.     Defendants' refusal to credit the costs of the expensive, non-consecutive-day short visits as child support is a violation of Plaintiffs' fundamental rights.  This does not meet the tests for strict scrutiny.

331.     WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, and award the following relief: (a) declare that the Order/Decree that Plaintiff Father and Minor Children  may see each other only twice monthly is a violation of Plaintiffs' civil rights, (b) declare that Defendants Order/Decree that that the Minor Children should not have a meaningful relationship with Plaintiff Father violates the Plaintiffs' fundamental rights and that the Order/Decree does not meet strict scrutiny, (c) declare that costs incurred by Plaintiff Father in traveling and for supervisor's fees be credited as child support payments, (d) preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to refrain from enforcing the Original Order or Amended Order with regard to restrictions on visits between Plaintiff Father and Plaintiff Minor Children, (e) preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, to immediately and without delay take steps to modify custody and

visitation and with oversight of due process of same by this Court (f) declare that Defendants acted as advocates and not as neutral state actors who acted with due impartiality with regard to the foregoing, (g) declare that Defendants do not have judicial immunity with regard to foregoing acts and omissions, but have at most limited immunity and are accordingly subject to damages, (h) declare that Plaintiffs may proceed with a jury trial on the issue of damages by Defendants, and (i) grant Plaintiffs such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

332.    Plaintiffs demand a trial by jury of all triable issues.


Respectfully submitted,

By: /s/Webb Millsaps
**WEBB MILLSAPS**
**Plaintiff/Attorney for Plaintiffs Minor Children**
Florida Bar No.: 32414
Webb@WebbMillsapsLaw.com
**WEBB MILLSAPS LAW, PL**
160 W. Camino Real, #190
Boca Raton, FL 33432
Telephone: 561-900-7238
Facsimile: 866-741-0009